✎AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

Southern ——— District of ——— New York



VERONICA PEARSON

V.

THE UNIFICATION THEOLOGICAL
SEMINARYand KATHY WININGS

## SUMMONS IN A CIVIL ACTION

CASE NUMBER:

08 CIV 8326

TO: (Name and address of Defendant)

THE UNIFICATION THEOLOGICAL SEMINARY
NEW YORK CITY EXTENSION CENTER
4 West 43rd Street, NY 10036

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Ian Francis Wallace, Esq.
LAW OFFICES OF IAN WALLACE, PLLC
501 Fifth Avenue -19th Floor
New York, New York 10017
(212) 661 5306

an answer to the complaint which is served on you with this summons, within _____20_____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

SEP 2 6 2008

CLERK

(By) DEPUTY CLERK

DATE

AO 440  (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant.  Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

    Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

      I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
                   Date                *Signature of Server*

                                       _____
                                         *Address of Server*

_____

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

Southern _____ District of _____ New York

VERONICA PEARSON

V.

THE UNIFICATION THEOLOGICAL
SEMINARYand KATHY WININGS

## SUMMONS IN A CIVIL ACTION

CASE NUMBER:

08 CIV 8326

TO: (Name and address of Defendant)

KATHY WININGS
THE UNIFICATION THEOLOGICAL SEMINARY
NEW YORK CITY EXTENSION CENTER
4 West 43rd Street, NY 10036

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Ian Francis Wallace, Esq.
LAW OFFICES OF IAN WALLACE, PLLC
501 Fifth Avenue -19th Floor
New York, New York 10017
(212) 661 5306

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

SEP 2 6 2008

CLERK

_____
(By) DEPUTY CLERK

DATE

AO 440  (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| Service of the Summons and complaint was made by me[(1)] | DATE |
|---|---|
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐  Served personally upon the defendant.  Place where served:

☐  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐  Returned unexecuted:

☐  Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____    _____
                          Date                              *Signature of Server*


                                        _____
                                                  *Address of Server*

_____
(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

JUDGE BUCHWALD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
VERONICA PEARSON,                                   Index No.:

                                    Plaintiff,



                      -against-                     **COMPLAINT AND
                                                    JURY DEMAND**

THE UNIFICATION THEOLOGICAL SEMINARY
and KATHY WININGS,

                                    Defendants.
-------------------------------------------------------------------x

## PRELIMINARY STATEMENT

1.      Plaintiff brings this action for race and color discrimination with respect to terms and

conditions of employment pursuant to 42 U.S.C. § 1981 ("Section 1981"), New York State

Human Rights Law, Executive Law §290, *et seq.* ("SHLR") and the New York City Human

Rights Law, §8-107 *et seq.* of the Administrative Code ("CHRL").

2.      Plaintiff brings this action for disability discrimination with respect to terms and

conditions of employment pursuant to SHLR and CHRL.

3.      Plaintiff asserts claims for retaliatory discharge in violation of the SHLR and the CHLR

for engaging in protected activity, namely formally complaining of race discrimination, hostile

work environment and harassment against Defendants.

4.      Plaintiff brings this action for violations of the Family Medical Leave Act, 29 U.S.C.S. §

2601 *et seq.* ("FMLA").

1

## JURISDICTION

5.   Jurisdiction is conferred upon the Court by 28 U.S.C. §§ 1331, 1343 and 1367.

6.   Venue lies in the Southern District of New York in that the unlawful actions complained of and the records relevant to such practices are maintained and administered within the State of New York and within this district.

7.   All conditions precedent to the institution of this suit have been satisfied.

## PARTIES

8.   Plaintiff Veronica Pearson ("Plaintiff" or "Ms. Pearson") is an African-American woman and resident of New York City.

9.   At all relevant times, Plaintiff has suffered from bipolar manic-depressive syndrome, which is a serious psychiatric medical condition and a substantially limiting impairment.

10.   Plaintiff had a record of such an impairment and/or was perceived as being thus impaired by Defendants.

11.   At all relevant times, Plaintiff's psychiatric condition, when acute, severely limited her in certain major life activities and required hospitalization.

12.   Thus, Plaintiff has a serious medical condition for the purposes of bringing suit under the FMLA and was at all relevant times disabled as that term is understood under the SHRL and CHRL.

13.   Defendant The Unification Theological Seminary ("UTS") is registered in New York State as a not-for-profit corporation.

14.   UTS employs in excess of one hundred employees and is in the business of providing

2

graduate and post-graduate degree courses in theology and religious instruction.

15.    UTS has places of business at 30 Seminary Drive, Barrytown, NY 12571 and 4 West 43rd Street, NY 10036 (the latter is known as the "NYC Extension Center.")

16.    Defendant Dr. Kathy Winings ("Defendant Winings"), who is Caucasian, is the Dean of the NYC Extension Center and Director of the "Doctorate of Ministry Degree Program" administered by the UTS and was, at all relevant times, Plaintiff's direct supervisor. Ms. Winings personally committed and/or directed the discriminatory acts alleged herein against Plaintiff and personally made the decision to unlawfully terminate Plaintiff's employment.

17.    All Defendants are employers within the meaning of the laws being sued hereunder.

## STATEMENT OF FACTS

18.    UTS hired Plaintiff in July 2005 as an Admissions Officer for the NYC Extension Center at the starting annual salary of approximately $20,000.

19.    Plaintiff's chief role was to interview for enrollment students not belonging to the Unification Church for courses at UTS's NYC Extension Center, which was then located on the 9th floor of 481 8th Avenue, New York City (the "481 8th Avenue location").

20.    At her hiring interview, Defendant Winings stressed to Ms. Pearson that UTS was a "private" non-denominational, interfaith seminary, that was "separate" from the Unification Church and that students from all backgrounds and beliefs were welcomed to enroll in courses at UTS.

21.    Defendant Winings also told Plaintiff that UTS's students would not be pressured or forced to attend any activities related to the Unification Church nor would they be encouraged to

3

adopt the "Unificationist" philosophy and doctrine.

22.     UTS's President, Dr. Tyler Hendricks, a Caucasian man, reiterated this to Plaintiff in a follow-up interview, claiming that UTS was its own entity and that its mission statement was not related to the Unificationist movement.

23.     UTS underlines its interfaith status in its advertising.

24.     In a UTS brochure it states that "[i]n September 2000 the Manhattan Extension opened its doors to offer students from all denominations and churches a biblical, theological and historical understanding of the Christian faith, and God's work through the religions of the world, while learning how to create effective ministries filled with God's love and spirit."

25.     It was only based on these assurances by Defendant Winings and Dr. Hendricks that UTS's students would in no way be encouraged to adopt Unification Church doctrine that Plaintiff accepted the position and resigned her full time position at Devry College, where she had been the Educational Advisor earning approximately $68,000 annually.

26.     In September, 2005, Defendants raised Plaintiff's salary to $30,000.

27.     Despite being hired and compensated on a part-time basis, Plaintiff worked approximately 35 hours a week for UTS during 2005 and the first half of 2006.

28.     Due to her excellent work performance, in July 2006 Plaintiff was offered and accepted the full time position of Admissions Director and her salary was raised to $40,000 per year.

29.     At this point, Plaintiff began to work well in excess of 50 hours per week.

30.     Because of Plaintiff's diligent efforts, within three months of starting work for Defendants, Ms. Pearson doubled student enrollments at the NYC Extension Center.

4

31.     Within six months of being hired, Plaintiff increased the NYC Extension Center by over 500%, from 15 students to 80 students.

32.     Plaintiff single-handedly devised and drafted many of UTS's policies and enrollment/registration procedures, which it formerly lacked, trained the Registrar, Davetta Ogunlola, to perform her duties – Ms. Ogunlola lacked the work experience and qualifications necessary for her position - and also drew up job descriptions for various positions, including her own.

33.     Plaintiff performed and personally funded many other activities for UTS that Defendants failed to compensate and/or reimburse her for.

34.     For example, Ms. Pearson purchased with her own money a carpet, rug, shelving and other furniture for her office, the student lounge and Defendant Winings' office, for which Plaintiff received no reimbursement.

35.     While not her responsibility, Ms. Pearson was also required to move furniture, host social events and drive vans for which she was not compensated.

36.     In any given week, Plaintiff would work between 50-70 hours, often over the weekend, but Defendants failed to compensate Plaintiff for this extensive overtime.

### UTS's Illegal, Unethical and Discriminatory Practices

37.     During her employment, it became apparent to Ms. Pearson that the UTS, its Managers and Directors were engaging in unethical and possibly unlawful practices.

38.     For example, during the enrollment process, Plaintiff learned that some of the students awarded scholarships to study at UTS only had visitor or tourist visas that did not permit them to

5

study in the United States.

39.     Plaintiff raised her concerns regarding these practices with Defendants Winings, who assured Plaintiff that it was "not a problem" but did not expand.

40.     Upon information and belief, many members of the Unification Church are foreign and brought to the United States to perform very low paid work for the Unification Church.

41.     Plaintiff found this out as during her employment with UTS many of these foreign church members complained bitterly to Plaintiff that they lacked enough money to feed themselves and their families.

42.     Plaintiff felt compelled to give money to some of these church members.

43.     A Honduran woman, who was a member of the Unification Church, claimed to Plaintiff that she made her living selling flowers for the Unification Church on the weekends and that she could not seek employment elsewhere.

44.     Also, over Plaintiff's explicit objections, UTS and Defendant Winings were enrolling students on its Masters and Doctorate degree programs who lacked the required academic qualifications

45.     For example, Plaintiff refused to register students for UTS's Masters of Divinity program who lacked a Bachelors degree.

46.     Yet, Plaintiff was required by Defendant Winings to send these applicants to Defendant Winings who would then conduct a "follow up" interview and often admit these students, giving them a "special status."

47.     On one occasion, Plaintiff interviewed a prospective African-American student, "Linda",

6

but refused to admit her onto the Masters program since Linda did not have a Bachelors degree, was not computer literate and lacked basic reading and writing skills.

48.     Plaintiff advised Dr. Winings that Linda should not be accepted onto the Masters program for the foregoing reasons.

49.     Yet Dr. Winings accepted Linda, and she was granted a scholarship and allowed to take several classes for which she was academically ill-suited.

50.     Plaintiff spents many long hours with Linda helping her with, for example, the rudiments of operating a computer.

51.     Upon information and belief, enrolling students onto UTS's Masters of Divinity program and granting a Masters degree without the requisite academic credentials would violate the terms of UTS's accreditation received from the Middle States Commission on Higher Education and also violates New York State Education Department's terms of registration.

52.     Plaintiff raised her concerns with Defendant Winings that students were being enrolled without Bachelors degrees, but to no avail and Defendant Winings claimed that it was acceptable for schools to accept such students under a "special status."

53.     UTS's students also complained to Plaintiff that they were being forced to attend church services and religious events as part of their curriculum.

54.     During her enrollment interviews, under Defendant Winings' direction, Ms. Pearson told all prospective students that at no time would they be forced or encouraged to have any affiliation with the Unification Church or any religious entity.

55.     The vast majority of the prospective students that Plaintiff interviewed for admission

were not members of the Unification Church and had their own religious affiliations or sometimes had no religious affiliation.

56.     Almost all of these interviewees expressed to Ms. Pearson a concern not to become part of the Unificationist Church movement by enrolling at UTS and many feared negative feedback from church communities and pastors who were against mixing faith practices and doctrines.

57.     Despite assurances given to them prior to enrollment, several of UTS's students complained to Plaintiff that they felt pressure from their professor, Rev. Lonnie McLeod, an Adjunct Professor of Ministry, to attend "Fellowship and Prayer Breakfasts" run by the American Clergy Leadership Conference ("ACLC").

58.     Apparently, Rev. McLeod was strongly encouraging students to attend the prayer meetings during his Divinity Class.

59.     Rev. McLeod is a Pastor and a member of ACLC.

60.     Upon information and belief, the ACLC is one of many organizations set up by the Unification Church and/or affiliated with it.

61.     UTS students who attended relayed to Plaintiff that at the "Fellowship and Prayer Breakfasts" the ACLC would fund raise and recruit members.

62.     UTS's Student Body President, Leander Hardaway, also strongly encouraged UTS's students to attend the ACLC Prayer Breakfasts. Mr. Hardaway has been a member of the ACLC for many years.

63.     Defendant Winings even asked Ms. Pearson to recruit ACLC clergy members at these prayer meetings to become students at UTS but Plaintiff resisted for fear that it would appear that

8

the UTS was a part of or affiliated with the ACLC.

64.     Plaintiff told Defendant Winings she was strongly opposed to the recruitment of unsuspecting students into an organization affiliated with the Unification Church at these so-called "Prayer Meetings."

65.     Certain UTS students also complained to Plaintiff that Rev. McLeod was compelling them to attend church services at UTS's 4 West 43rd Street location, the Unification Church's headquarters in New York City. Rev. McLeod was the pastor at these church services held on Saturday mornings.

66.     These church events were organized by Rev. McLeod under the guise of his own church organization that he was creating with UTS's student body.

67.     Students complained to Plaintiff that Prof. McLeod was compelling them to attend his church services as part of their Divinity class curriculum.

68.     Plaintiff raised this serious issue with Defendant Winings, who responded that Plaintiff should "take it up with Rev. McLeod" but otherwise failed to take action.

69.     On the contrary, Defendant Winings fully acquiesced in the "arm twisting" that was going on and did nothing to address Plaintiff's or the students' concerns.

70.     Plaintiff reassured students, however, that they always reserved the right to withdraw from classes if they felt pressure from faculty to attend church activities.

### Upon Information and Belief, UTS's Activities Breached the Terms of Its Charitable Charter

71.     Unknown to Plaintiff, the UTS is incorporated in New York as a non-profit, tax-exempt institution that is supposed to be operating *exclusively* for the "religious and educational purpose

9

of spiritually, theologically and professionally training leaders of the Unification Church."

72.     UTS's Provisional Charter states that the purpose in forming the corporation is, *inter alia,* "to provide theological education in order to prepare students for leadership in the Unification Church and for the practice of many types of ministry, such as Church Center directorship, campus ministry, evangelism, religious education and missionary work."

73.     Under UTS's bylaws, UTS's primary mission it to "spiritually, theologically and professionally train leaders of the Unification Church."

74.     Therefore, contrary to Defendants' representations to Plaintiff and to its students, in reality UTS is an integrated auxiliary of the Unification Church.

75.     Had Plaintiff known of the UTS's stated primary mission she would never have accepted to work for the school.

76.     Moreover, one of Plaintiff's roles - to increase the enrollment of fee paying students at the NYC Extension Center – appears to be in direct contradiction to UTS's stated charitable purpose.

77.     Also, Defendant Winings encouraged Plaintiff to capitalize on her personal work contacts with the high level administration at Medgar Evers College in order to aid the UTS in establishing a collaboration with that college with the aim of increasing enrollment of fee paying students and increasing UTS's revenue.

78.     Defendant Winings intended to set up with Medgar Evers College a fee sharing structure whereby UTS could generate capital by offering a fee-based certificate program, in particular for students lacking an undergraduate degree, and the profits shared between UTS and Medgar Evers College.

79.     By actively and aggressively enrolling fee paying students who were not members or had any affiliation with the Unification Church, UTS may have been violating the charter granted to it by New York State and contravening its non-profit charitable status.

### The Race Discrimination at UTS Generally

80.     UTS's student body at the NYC Extension is composed almost exclusively of persons of African descent, whereas UTS's administration and management were almost without exception composed of Caucasians and Asians.

81.     This reflected the demographic makeup of the Unification Church within the United States, where the upper echelon, including the Board of Directors, are almost exclusively Caucasian and Asian; whereas Latinos and persons of African descent comprise the lower level church members who lack a real voice in the organization.

82.     When Ms. Pearson was hired, several students complained to her that they felt Defendant Winings was not receptive to their needs.

83.     Plaintiff soon learned that numerous students had already lodged formal complaints of race discrimination against Defendant Winings, including an African-American student called Aisha, and also, an Ethiopian and Jamaican student, and a student from the Ivory Coast.

84.     Upon information and belief, UTS failed to address or investigate these complaints.

85.     Other students of African descent complained that the few Asian students at the NYC Extension were all placed on UTS's Honor's Roll, despite speaking very little English and having missed class and not completing assignments on time.

86.     Aisha even told Plaintiff that she believed the UTS hired Ms. Pearson as a "token" Black

11

person in an effort to sheild itself from liability for race discrimination claims.

87.     Plaintiff also learned that her immediate predecessor as Admissions Officer, Lisa Alvarado, a Black woman from the Cameroon, had filed charges of race discrimination and retaliation with the EEOC against UTS, Defendant Winings personally and against Larry Brown, a Caucasian housing manager for the Unification Church at the 481 8th Avenue location where Ms. Alvarado was formerly housed.

88.     Ms. Alvarado asserted in connection with her charge that Defendant Winings told her "You can't lock up a white man!" when Ms. Alvarado was attempting to remedy certain unlawful actions by Mr. Brown.

89.     Upon information and belief, after conducting an investigation, the EEOC found probable cause to believe that the UTS, Defendant Winings and Mr. Brown had discriminated against Ms. Alvarado.

### Plaintiff Suffers Race Discrimination and Retaliation Culminating in Her Unlawful Discharge

90.     Plaintiff's work environment was also permeated with racial tension largely created by Defendant Winings.

91.     For example, Defendant Winings began to undermine Plaintiff, reduce her authority and countermand her admission decisions and policies without reason.

92.     For example, in September, 2006, and without explanation, Defendant Winings attempted to give responsibility for organizing UTS's convocation event to a student, Leander Hardaway, which was one of Plaintiff's duties.

93.     Mr. Hardaway, who clearly lacked the experience for such a task, was not even employed

by UTS.

94.     Defendant Winings routinely excluded Plaintiff from important decisions and conference calls on issues within Ms. Pearson's purview, including calls with UTS's Board of Directors.

95.     Strikingly, Plaintiff was never allowed to attend senior management "President Cabinet" meetings for all department heads at the UTS's main campus in Barrytown held every five or six weeks.

96.     Because she was the Head of NYC Extension Center's Admissions Department, Plaintiff was supposed to be present at these meetings with her fellow administrators yet Defendant Winings always refused to inform Plaintiff of the date and time of these meetings.

97.     Plaintiff never attended one President Cabinet meeting throughout her employment, the only department head at UTS who was routinely excluded.

98.     Moreover, had she attended these meetings, she would have been the only African-American or black person present.

99.     Ritz Yamamoto, an Asian field recruiter for UTS and lower in rank than Plaintiff, began to attend "President Cabinet" meetings within his first month of employment.

100.    Perceiving obvious tension and Defendant's Winings negative demeanor and uncooperative attitude towards Plaintiff, UTS's students often asked Ms. Pearson if Defendant Winings "got along with her" or "liked her."

101.    In or about May 2006, Defendant Winings instructed Plaintiff to attend a meeting with the UTS's Board of Directors as they wanted to "look her over."

102.    Present at this meeting were also leaders and directors of other entities affiliated with the

13

Unification Church, who, with only one exception, were all Caucasian or Asian males.

103.   One of the main purposes of this board meeting was to address why there were not more "second generation" Unificationist members registering for courses at UTS, i.e., the children of Unificationist couples.

104.   On this issue, Plaintiff stated at the meeting that her role was a contrary one, which was to encourage students from *all* backgrounds, whatever the religious affiliation, to take courses at UTS.

105.   On or about November 10, 2006, Plaintiff sent an email to Dr. Hendricks seeking a meeting with him to complain about the ongoing racially-motivated harassment and undermining of her authority that she was enduring at the hands of Ms. Winings.

106.   Dr. Hendricks failed to meet with Plaintiff to address her concerns.

107.   Meanwhile, on November 27, 2006, UTS began an aggressive advertising campaign with ads appearing in "AM New York" to obtain students to enroll at the NYC Extension Center.

108.   These advertisements indicated only Plaintiff's name and direct extension as the contact at UTS.

109.   Starting 7 AM on November 27, 2006, Plaintiff individually fielded hundreds of calls from prospective students enquiring about UTS's courses and responding to the newspaper ads.

110.   On this day, Ms. Pearson worked 17 hours without a break.

111.   The increased responsibilities, total lack of assistance and the ongoing harassment by Defendant Winings, all took their toll on Ms. Pearson, who began to suffer extreme stress and sleeplessness.

112.    This exacerbated Plaintiff's bipolar condition.

113.    On December 2, 2006, Plaintiff sent another email to Mr. Hendricks complaining of the race discrimination at the hands of Defendant Winings and seeking his urgent intervention.

114.    In this email, Ms. Pearson also alerted Mr. Hendricks to the racist conduct that Ms. Winings was accused of by students and to the fact that she believed Defendant Winings terminated Ms. Alvarado's employment for racist reasons and therefore that Ms. Alvarado should be reinstated.

115.    Dr. Hendricks failed to address the issues raised in that December 2, 2006 email.

116.    Instead, he advised Plaintiff to focus on the ad campaign and that Defendant Winings was going to be on vacation during the week beginning December 4, 2006.

117.    On December 4, 2006, Plaintiff arrived at work at 5 AM to prepare to field calls from the promotional ads and put up holiday decorations.

118.    After some hours at work, Plaintiff left work briefly and returned approximately at 8 AM.

119.    Upon her return, and without warning or explanation, the building's security officers aggressively insisted on escorting Plaintiff to her office.

120.    Then, a person that worked in building maintenance insisted that he accompany Plaintiff onto the elevator.

121.    Plaintiff insisted that a female security officer accompany her, however.

122.    Plaintiff was very disturbed by these events, as throughout her employment, the security guards had never insisted on escorting Plaintiff to her office.

123.    Then Plaintiff was shocked to see Defendant Winings arrive at the office at

15

approximately 9.15 AM given that Dr. Hendricks said she would be on vacation that day.

124.    Defendant Winings usually never arrived to work until around 11 or noon.

125.    At this time, a heated argument ensued between Plaintiff and Defendant Winings, the stress of which caused Plaintiff to suffer a manic episode.

126.    Without justification, Defendant Winings then called for the police to arrest Ms. Pearson.

127.    When the police arrived they immediately saw that Plaintiff was in distress and they called the Emergency Medical Services.

128.    Plaintiff was then taken by ambulance to the Cabrini Medical Center where she remained for 11 days against her will.

129.    Plaintiff was diagnosed as having suffered a manic episode due to her bi-polar condition brought on by work stress.

130.    Defendants were immediately informed of Plaintiff's admission to Hospital and that it was related to a manic-episode and Plaintiff's bi-polar condition.

131.    Throughout Plaintiff's hospital stay, her treating physicians and/or the hospital employees were in contact with UTS regarding Plaintiff's condition.

132.    While in hospital, Plaintiff called Cliff Yasutake, UTS's Business Manager in the Barrytown Campus, to advise him that she had been admitted to hospital and needed information about her medical benefits.

133.    Despite full knowledge of Plaintiff's condition, Defendants unlawfully terminated Plaintiff's employment on the day following her admission, December 5, 2006.

134.    Plaintiff did not know that her employment had been terminated until December 15,

16

2006, when she was released from Hospital and went to directly to work.

135.    When she arrived at the NYC Extension Center, Ms. Pearson attempted to hand her hospital discharge papers and medical notes to Defendant Winings to document her absence.

136.    In response, Defendant Winings told Ms. Pearson that her employment had been terminated effective December 5, 2006 and handed her a termination notice.

137.    Plaintiff later discovered that a day after Plaintiff's admission to hospital, Defendants placed an official notice from UTS on Plaintiff's office door stating that she had suffered a nervous breakdown, had been hospitalized and was no longer "available."

138.    Many of the UTS's students, faculty and friends of Plaintiff were shocked and concerned to see such a personal and private statement about Ms. Pearson posted in this very public way for all to see.

139.    Defendant Winings and other employees of UTS told UTS's students and employees that Plaintiff had suffered a "nervous breakdown."

140.    Subsequently, Defendants opposed Plaintiff's request for unemployment insurance benefits claiming that Ms. Pearson was disqualified from receiving benefits because she violated their policies.

141.    At a hearing held before an Administrative Law Judge to determine Plaintiff's entitlement to unemployment benefits, Defendant Winings conceded that there was something clearly "wrong" with Ms. Pearson on December 4, 2006, that she was "not making sense" and was "incoherent."

142.    Defendant Winings also admitted that Ms. Pearson had never before behaved in such a

17

manner.

143.   Accordingly, the Department of Labor found that Ms. Pearson was entitled to unemployment benefits as she had "lost her job for actions beyond her control which does not constitute misconduct within the meaning of the unemployment insurance law."

144.   At this same unemployment hearing, Plaintiff's treating physician from Cabrini Medical Center, the Chief of the Inpatient Psychiatry Unit, Dr. Alexander Deutsch, testified that he spoke with a "gentleman" from UTS who was "building up a case" to terminate Plaintiff's employment and that during this conversation, Dr. Deutsch spoke about Plaintiff's medication and hospitalization.

145.   Plaintiff was at all relevant times able to perform the essential functions of her position, without reasonable accommodation.

146.   After being cleared for work by her doctors, Plaintiff was willing and able to resume the position she occupied prior to her medical leave.

147.   Defendants made the decision to terminate Plaintiff's employment as the Admissions Director because Plaintiff was forced to take medical leave, in violation of the FMLA.

148.   At all relevant times, Defendants knew their obligations under the FMLA but wilfully violated those obligations.

149.   Defendants committed, were aware of, authorized and condoned the discriminatory and unlawful behavior stated herein.

150.   The actions stated herein were discriminatory and unlawful in that they were motivated because of Plaintiff's disability and in retaliation for the sum of Plaintiff's protected activity,

including an emailed complaint of race discrimination sent to UTS's President three days prior to Ms. Pearson's discharge.

151.    The actions complained of herein were committed willingly, with reckless disregard to Plaintiff's rights and constitute a continuing policy and practice of discrimination.

152.    Defendant Winings aided and abetted the discriminatory and retaliatory action, personally condoned and/or directed the discriminatory conduct and personally made the decision to terminate Plaintiff's employment along with Dr. Hendricks.

### FIRST CAUSE OF ACTION: SECTION 1981

153.    The allegations in the preceding paragraphs are repeated here as if fully stated.

154.    Defendants intentionally retaliated against and discriminated against Plaintiff on the basis of her race and color in violation of Section 1981.

155.    Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $3,000,000.

### SECOND CAUSE OF ACTION: RACE DISCRIMINATON AND RETALIATION (SHRL)

156.    The allegations in the preceding paragraphs are repeated here as if fully stated.

157.    Defendants intentionally racially discriminated against Plaintiff and created a racially hostile work environment in violation of the SHRL.

158.    In violation of the SHRL, Defendants intentionally retaliated against Plaintiff because of the sum of Plaintiff's protected activity, namely complaining to Defendant Winings and UTS's President, and others, of Defendants' race discrimination, harassment and hostile work environment.

159.   Defendants' actions were a malicious, willful and reckless violation of Plaintiff's rights.

160.   Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $3,000,000.

## THIRD CAUSE OF ACTION: RACE DISCRIMINATION AND RETALIATION (CHRL)

161.   The allegations in the preceding paragraphs are repeated here as if fully stated.

162.   Defendants intentionally racially discriminated against Plaintiff and created a racially hostile work environment in violation of the CHRL.

163.   In violation of the CHRL, Defendants intentionally retaliated against Plaintiff because of the sum of Plaintiff's protected activity, namely complaining to Defendant Winings and UTS's President, and others, of Defendants' race discrimination, harassment and hostile work environment.

164.   Defendant Winings personally aided and abetted in the discrimination, harassment and retaliation.

165.   Defendants' actions were malicious, willful and reckless violation of Plaintiff's rights.

166.   Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $3,000,000.

## FOURTH CAUSE OF ACTION: FMLA

167.   The allegations of the preceding paragraphs are repeated here as if fully stated.

168.   In terminating Plaintiff's employment for having taken FMLA medical leave for a serious medical condition, and not reinstating her to her former position, Defendants intentionally violated the FMLA by interfering with, restraining and/or denying Plaintiff's

20

attempts to exercise her rights under the FMLA.

169.   Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $3,000,000.

## FIFTH CAUSE OF ACTION: DISABILITY DISCRIMINATION (SHRL)

170.   The allegations in the preceding paragraphs are repeated here as if fully stated.

171.   Defendants intentionally discriminated and retaliated against Plaintiff on the basis of a disability, a record of disability and/or a perceived disability in violation of the SHRL.

172.   Defendants' actions were a malicious, willful and reckless violation of Plaintiff's rights.

173.   Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $3,000,000.

## SIXTH CAUSE OF ACTION: DISABILITY DISCRIMINATION (CHRL)

174.   The allegations in the preceding paragraphs are repeated here as if fully stated.

175.   Defendants intentionally discriminated and retaliated against Plaintiff on the basis of a disability, a record of disability and/or a perceived disability in violation of the CHRL.

176.   Defendant Winings personally aided and abetted in the discrimination.

177.   Defendants' actions were malicious, willful and reckless violation of Plaintiff's rights.

178.   Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $3,000,000.

WHEREFORE, Plaintiff demands that judgment be granted as follows:

A.  The amount sought for each cause of action;

B.  Liquidated damages;

21

C.  Punitive damages; and

D.  Attorneys fees and costs.

Dated:  New York, New York
        September 25, 2008

                                    **LAW OFFICES OF IAN WALLACE, PLLC**

                    By:     _____
                            Ian Wallace (IW 3100)
                            *Attorney for Plaintiff*
                            501 Fifth Avenue -19[th] Floor
                            New York, New York 10017
                            (212) 661 5306