```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
VERONICA PEARSON,

                    Plaintiff,

         - against -

THE UNIFICATION THEOLOGICAL SEMINARY
and KATHY WININGS,

                    Defendants.
---------------------------------------X
```

**MEMORANDUM AND
ORDER**

08 Civ. 8326 (NRB)

**NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE**

Plaintiff Veronica Pearson brings this action against the Unification Theological Seminary ("UTS") and Kathy Winings, the Dean of UTS' New York City Extension Center and Director of the "Doctorate of Ministry Degree Program." Plaintiff, a former admissions officer, alleges that UTS and Winings discriminated against her on the basis of her race in violation of 42 U.S.C. § 1981 ("Section 1981") and parallel state and municipal laws, and retaliated against her in violation of these laws for her complaints of racial discrimination. She also claims defendants violated her rights under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. ("FMLA"), and discriminated against her as a result of a disability in violation of state and municipal laws. Now pending is defendants' motion for summary judgment on all of plaintiff's claims. As addressed below, the motion is granted. As the only remaining claim is

defendants' counterclaim for assault, we dismiss the case for lack of jurisdiction.

## FACTS[1]

UTS is a non-profit institution which provides graduate and post-graduate degree courses in theology and religious instruction. The main offices are in Barrytown, New York, but there is an "Extension Center" located in the New Yorker Hotel in New York City where courses are taught. Veronica Pearson was hired as an Admissions Officer for the Extension Center in July 2005. This position was part-time, and her starting salary was $20,000 with an understanding that it would rise to $30,000 in September 2005 if her employment was successful. Pearson was hired after an interview with Kathy Winings, defendant in this action, and a follow-up interview with Tyler Hendricks, the President of UTS. In September 2005, Pearson's salary was raised to $30,000. In July 2006, Pearson was offered and accepted a full time position and a raise to $40,000. Pearson claims her new full-time position was Admissions Director of the Extension Center, but defendants argue that her job duties did not change. According to Pearson, these raises and promotions were the result of her good performance. As Admissions Director, Pearson worked "between 50-70 hours" in "any given week" and often

---

[1] Unless otherwise stated, these facts are taken from plaintiffs' complaint and affidavit and defendants' statement of facts. Citations to these submissions will only follow direct quotations.

worked on the weekends. Pl. Aff. ¶ 44. She claims that she was very successful in this position; she enrolled many new students and was constantly working to recruit more.

Pearson asserts that during her employment she discovered systemic racism within UTS. She notes that the upper echelon of the organization, both overall and at the Extension Center, was almost exclusively Caucasian or Asian whereas the "lower level church members who lack a real voice in the organization" were nearly all "Latinos and persons of African descent." Pl. Aff. ¶¶ 59-60. She states that she learned that "numerous students" had lodged "formal complaints of race discrimination against Defendant Winings," and offers a few examples. Pl. Aff. ¶ 62.

During her employment, Pearson became greatly concerned about the experience of one of her predecessors at UTS. Lisa Alvarado, a black female from Cameroon, was fired by UTS and subsequently filed a charge with the EEOC alleging discrimination based on race, gender, and national origin. Pearson claims that she discovered that "certain students" had "complained that they believed that Defendant Winings was the cause for [sic] Lisa Alvarado's unlawful discharge from the UTS," and that one of the students told Pearson that UTS hired her as a "'token' Black person in an effort to shield itself from liability for race discrimination claims." Pl. Aff. ¶ 61. Plaintiff also provides a petition, signed by twelve students in

June 2004, which protested Alvarado's discharge and was addressed to Winings. Ex. 32 to Affirmation of Ian Wallace in Opp'n to Motion for Summary Judgment ("Wallace Affirm."). At some point while working at UTS, Pearson came across a fax from the EEOC which stated that the Commission "has determined there is reasonable cause to believe [Alvarado] was terminated by [UTS] because of her race and national origin. There is also reasonable cause to believe [Alvarado] was retaliated against by [UTS] because she filed a Charge of Discrimination with the EEOC." Ex. 29 to Wallace Affirm. Pearson believes that the "incident with Ms. Alvarado triggered much racial tension within the Extension Center." Pl. Aff. ¶ 75

Pearson claims that she personally suffered discrimination at UTS as well. She believes her experience was "very similar" to Alvarado's, and alleges that she suffered discrimination "predominately at the hands of Winings." Pl. Aff. ¶¶ 77-78. Pearson asserts that Winings undermined her authority and countermanded her admissions decisions without justification. She claims that Winings attempted to assign responsibility for organizing UTS' convocation event to a student who was not a paid employee of UTS[2] even though this was one of Pearson's "main duties." Pl. Aff. ¶¶ 80-81. She also complains that Winings

---

[2] Defendants point out that this student, who ultimately replaced Pearson as an employee of UTS following her termination, is also African-American. Defendants' Statement of Facts ("Defs.' SF") ¶ 62.

"routinely excluded [her] from important decisions and conference calls on issues within [her] responsibilities." Pl. Aff. ¶ 82. Specifically, she complains that she was "never allowed to attend senior management" meetings despite the fact that she was "supposed to be present at these meetings with [her] fellow administrators," that she was the "only department head at UTS at that time who was routinely excluded," and that a "field recruiter" of Asian descent, who was not at administrator, "began to attend" the meetings "within his first month of employment." Pl. Aff. ¶¶ 82-85, 87. Pearson claims that she never attended one of these senior management meetings, and that had she attended, she would have been "the only African-American or black person present." Pl. Aff. ¶ 86.

Pearson alleges that she first complained about the racism at UTS in an email sent to Hendricks on November 10, 2006. In this email, Pearson requested a meeting with Hendricks in order to discuss her concerns regarding her treatment by Winings. Pearson claims that when no meeting was scheduled, she sent another email to Hendricks on December 2 to reiterate her complaints of racial discrimination by Winings. In this email, Pearson provided examples of Winings' allegedly discriminatory conduct and informed Hendricks that she believed Alvarado was terminated for discriminatory reasons. This email sought Hendricks' "urgent intervention." Pl. Aff. ¶ 102. Pearson claims

that Hendricks again failed to substantively respond to her concerns, and that he instead advised her to focus on an upcoming ad campaign to recruit students to UTS and informed her that Winings would be on vacation the week beginning that Monday, December 4.

Pearson's next complaint to Hendricks, and the only one memorialized in the record before the Court,[3] was sent at 5:17 AM on December 4, 2006, less than a month from her first email to Hendricks. The complaint was sent via email to Hendricks which included Winings by carbon copy. The email stated:

> "Dear Dr Hendricks,
> After full investigation of the Unification theological Extension Centers,dismissal [sic] of Lisa F.M. Alvarado in 2004, by Dr. Kathy Winings Dean at the UTS extension Center, I bare witness that it was a deliberate act of RACISM IN AMERICA of the HIGHEST DEGREE. AND WHERE THERE IS NO JUST THEIR [sic] CAN BE NO (PEACE ON EARTH GOOD WILL TO ALL MANKIND)
> VERONICA, ADMISSION OFFICER AT UTS"

Ex. 17 to Wallace Affirm. (emphasis in original).

The events following this email on the morning of December 4 are highly disputed. According to Pearson, after sending the email from her work computer, she went home for a couple of hours before returning to the office at 8:00 AM. She claims that upon arriving back at the office, the building's security

---

[3] Plaintiff claims that she had records of the other emails on diskettes that were in her office at UTS and not returned to her following her termination. Only the December 4 email was retrieved from the defendants through discovery. Defendants state they must have deleted the other emails or otherwise let them expire from their email system. Plaintiff's Statement of Facts ¶¶ 117-19.

officers "aggressively insisted" on escorting her to her office.
Pl. Aff. ¶ 111. This "startled" Pearson, because the security
official demanding to ride the elevator with her was "very rude
and belligerent" and was a male whom she had never seen before.
Pl. Aff. ¶¶ 112-113. Plaintiff was "very disturbed" by this
treatment and began to get "nervous and a little hyper," because
she would "occasionally" see "women in halter tops and 'hot
pants' entering into the suites on the 9th floor accompanied by
other men" when she was working late. Pl. Aff. ¶¶ 116-117.
Pearson says she was informed by this unidentified man that he
had been instructed to accompany her upstairs, but that she
insisted a female officer accompany her instead. Pl. Aff. ¶¶
114-115. Pearson eventually made it upstairs, where she "saw
another male security officer" and had "trouble" with the key to
her office. Pl. Aff. ¶¶ 120-121. Pearson does not elaborate on
this trouble with her key, but says that she "finally" did get
into her office. These events left her "shaken" and "fearful."
Pl. Aff. ¶¶ 122-123.

Pearson claims that around 9:15 AM, Winings arrived at the
Extension Center for work. This surprised Pearson, as Winings
hardly ever arrived at work before 11:00 AM and she expected
Winings to be on vacation. When Winings stopped by Pearson's
office, Pearson informed her of the strange interaction with the
security guards and asked if she was responsible. She also asked

Winings why she was at the office when she was supposed to be on vacation. Pearson admits that she then told Winings she was a "racist and a liar and that there is no way in the world that a woman who is concerned about education would be doing something that would create this much division." Pl. Aff. ¶ 137. At this point, Winings left Pearson's office and, according to Pearson, stated "Veronica is having a nervous breakdown, somebody go get help, call the EMT." Pearson concurred with this assessment from her office, saying that she was "having a nervous breakdown because people are treating me very differently in an environment where I do not feel secure."

Pearson states that "two men dressed in suits" then arrived, and that she was pleased to see them since she assumed they were there to resolve the situation with Winings. Pearson told the men that she was just trying to focus on her advertising campaign but that Winings was part of "some whole operation to just cause me harm or have people cause me harm." It was at this point, she claims, that she said "everything would be fine as 'God would purify this place'" and then "rolled a half-empty plastic bottle of water that [she] had been drinking down the hall." Pl. Aff. ¶ 144. She asserts that Winings was nowhere in sight and had gone into her office at the time she rolled the water bottle.

Pearson claims she then went into her office, where she remained for about ninety minutes before Anthony Rice, a security official whom she knew and trusted, came to her door and offered her a cup of tea. Pearson opened the door, and saw two EMT specialists with Rice. The EMTs requested that Pearson allow them to examine her, and Pearson obliged. Pearson claims that she was relieved to see the EMT specialists, especially since one of them was a woman. She says that she then voluntarily left the office with the EMTs and went to Cabrini Medical Center in an ambulance, where it was determined that she "suffered a manic episode due to my bi-polar condition brought on by work stress." Pl. Aff. ¶ 153.

The defendants' version of events is markedly different. According to defendants, Winings arrived at the office on the morning of December 4[4] and noticed Pearson was sitting in her office talking very loudly. Winings greeted plaintiff, who allegedly responded: "You no longer work here. I am the new Dean. Get out of here." Defs.' Statement of Facts ("Defs.' SF")

---

[4] While defendants only discuss the events of December 4 in their statement of facts, the record demonstrates that plaintiff's questionable behavior began at least a week earlier. On November 28, Winings arrived at work and found a typed memorandum from Pearson stating that her boyfriend was taking her to Mexico City for a vacation and that she would return on Saturday. This was in violation of UTS rules that employees provide two weeks' notice for all vacations. In the days that followed, Pearson occasionally called Winings to report on her trip to Mexico. However, students and employees of UTS spotted Pearson walking "about UTS" over the course of the week, and at one point her boyfriend called into the office and asked to speak with Pearson. When informed that UTS was under the assumption that Pearson was in Mexico with him, he advised that this was not true and that he was calling from Manhattan. Ex. 6 to Wallace Affirm.

¶ 25. Winings assumed Pearson was joking, and proceeded to the student lounge. At this point, she claims she heard plaintiff "shouting and repeated[ly] swearing more loudly 'you are Satan,' 'damn you,' and 'f-ck you' before saying 'I will kill you, I will kill you.'" Defs.' SF ¶ 26. Winings went to her office, at which point Pearson came out to the hallway and continued shouting and swearing, stating that she "will kill" Winings. Defs.' SF ¶ 29. Pearson then emptied a bag of chips in the hallway and told Winings to "clean this up you white cracker. That is all you are worth – to clean up my mess." Defs.' SF ¶ 29. Pearson reiterated that she was going to kill Winings, and said "you can't rape my babies anymore." Defs.' SF ¶ 30. At this point, Winings claims that Pearson took a full sixteen ounce bottle of water and threw it at Winings' head "with full force." Defs.' SF ¶ 31. The bottle "barely" missed. Defs.' SF ¶ 31.

Winings claims that both she and Pearson then retreated to their respective offices, where she was "shaking and fearful that Plaintiff might come to her office and do something." Defs.' SF ¶ 34. Soon after, Winings went to Pearson's office to check on her. Pearson informed Winings: "I have called the police and they will arrest you now." Defs.' SF ¶ 35. Pearson continued to swear loudly, at which point another employee of UTS told Winings that she had contacted building security.

Winings went back to her office and placed a call to Hendricks. While Winings was in her office, security officers arrived. According to a "Security Incident Report" written by Anthony Rice, the security official mentioned above that Pearson knew and trusted, when security arrived Pearson was locked in her office. The incident report further notes:

> "Attempts to make contact with Ms. Veronica Pearson were negative.
> I was briefed that a filled plastic water bottle was hurled at Dr. Kathy Winings which missed. Which [sic] I observed located adjacent to Dr. Winnings [sic] Office on the floor
> I was briefed also that Christmas Ornaments were pulled down and thrown about the floor which I observed also.
>
> At 0940 hours due to the behavior by Ms. Pearson, a 911 call was made to NYPD in an attempt to dissolve the dispute.
>
> At 0943 hours I initiated a call to the office of Ms. Veronica Pearson due to knowing her has [sic] a friend and the UTS Administrator. In conversation Ms. Veronica Pearson seemed very upset and stated in words that she wanted to kill herself and was prepared to commit such action inside her office.
>
> At this time I notified NYPD of my conversation with Ms. Pearson and The [sic] decision was made to contact Emergency Medical Services.
> Emergency Medical Services arrived on scene at 1055 hours."

Ex. F to Declaration of Leroy Watkins in Support of Motion ("Watkins Decl."). The report then explains that, with NYPD and EMS present, Rice was able to convince Pearson to open the door in order to accept some tea. Once the door was open, EMS began

speaking with Pearson, and by 11:08 AM they were transporting Pearson to Cabrini Medical Center.

While we are mindful of the fact that credibility assessments are the province of the jury and that at this stage we are to resolve all conflicts and ambiguities in the plaintiff's favor, we note that there is significant evidence supporting the conclusion that the events of December 4 were far more extreme than plaintiff suggests and were much closer to defendants' version.[5] First, prior statements made by Pearson to various administrative agencies contradict the narrative that she provides to this Court. On December 20, 2006, Pearson admitted to the EEOC that she engaged in a "loud argument" with Winings on the morning of December 4. Ex. C. to Watkins Decl. More significantly, in June 2007 Pearson made a statement to an investigator at the Department of Labor in which she denied many of defendants' allegations, but admitted that she "did call [Winings] a racist numerous times" and that she "did throw a water bottle, but it was empty because I drank the water."[6] Id.

---

[5] In contrast to the substantial evidence offered by defendants, Pearson relies entirely on her current description of the events, which often contradicts her prior testimony in other proceedings, as well as circumstantial evidence suggesting that the defendants are lying.

[6] When confronted at her deposition with this prior inconsistent statement regarding the water bottle, Pearson responded that she had a "much clearer understanding [at the time of her deposition in August 2009 than in June 2007], largely because I'm not on any medication and I'm no longer as attached to the situation, and have a better recall of what was going on in the circumstances surrounding it." Ex. I to Wallace Affirm. at 248.

Following the investigation by the Department of Labor, an Administrative Law Judge ruling on Pearson's right to unemployment insurance benefits found that Pearson was surprised to see Winings at the office that morning, and that she:

> "became manic and asserted that the dean had been fired and replaced by the claimant herself. She proceeded to curse at the dean and said that she had to destroy the dean who was Satan. She also uttered racial abuse at the dean and threw a large water bottle at her."

Ex. 13 to Wallace Affirm.

Furthermore, two non-party witnesses to the events of the morning of December 4 have submitted affidavits in this action detailing Pearson's behavior. The affidavits both attest that Pearson was acting bizarrely and claiming to have replaced Winings as Dean. One statement accounts that "Veronica was screaming to [Winings] and look[ed] like she want it [sic] to hit her...she kept calling her Satan and screaming at her saying that someone wanted to rape her so immediately we called security. I told Kathy to go into her office and lock the door and wait for security because at this point I was afraid for Kathy safety." Ex. G to Watkins Decl. The other reports "a big commotion in the hall, [Pearson] was very agitated and screaming at someone, using four-letter words, Satan, etc. Furthermore, she threw a water bottle, which hit my office door with such

force, that it rattled in its frame. This went on for at least 20-30 minutes." Ex. H to Watkins Decl.

In addition, even if the incidents did not occur entirely as defendants claim, there are several significant facts with regard to the events of December 4 which are not in dispute. Pearson admits that she called Winings a "racist" and "liar" and said that there is "no way in the world that a woman who is concerned about education would be doing something that would create this much division." Pl. Aff. ¶ 137. There is also no question that the events of December 4 necessitated the presence of building security. Further, building security was unable to handle the situation alone, and called 911 to seek the assistance of the New York Police Department. Upon arrival, the police officers realized that they too were not equipped to resolve the situation, and called EMS. EMS arrived and took Pearson to the hospital, where she stayed for ten days.

Pearson was diagnosed at Cabrini with "bipolar manic-depressive syndrome." While there is some disagreement as to when the defendants became aware of Pearson's condition, for purposes of this motion we will accept plaintiff's claim that defendants knew of her disability prior to her termination on December 5, 2006. Such a conclusion makes logical sense given that defendants were well aware of the incidents of December 4

and that Pearson was to be at the hospitalized for at least seventy-two hours for observation. Ex. 39 to Wallace Affirm.

On December 5, 2006, Hendricks wrote a letter to Pearson in which he informed her that her employment had been terminated, effective immediately. Hendricks wrote that the "reasons for your termination are your disruptive behavior, property damage, curses and threats of harm addressed to your supervisor, Dr. Kathy Winings, on December 4, 2006. This conduct constitutes cause for termination pursuant to the UTS Employee Handbook." Ex. 5 to Wallace Affirm. The letter, a copy of which was sent to Winings, security officials at the hotel, and the Vice President of UTS, also informed Pearson that she was barred from entering UTS, both at the Barrytown campus and the Extension Center, and that she could recover her personal possessions by making advance arrangements with hotel security. Pearson was informed that security would escort her to and from her former office.

## DISCUSSION

A. Legal Standard

Summary judgment is appropriate only where the parties' submissions "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Summary judgment is inappropriate if the court, resolving all ambiguities and

drawing all reasonable inferences against the moving party, finds that the dispute about a material fact is "such that a reasonable jury could return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. Nat'l Union Fire Ins. Co. v. Deloach, 708 F. Supp. 1371, 1379 (S.D.N.Y. 1989) (quoting R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984) (internal quotation marks omitted)). It is thus insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996) (internal citations and quotation marks omitted). Further, while credibility determinations, weighing evidence, and drawing legitimate inferences from facts are functions that the court

must leave to the jury, if the nonmoving party does not present evidence from which a reasonable jury could return a favorable verdict, then summary judgment is appropriate. See, e.g., Golden Pac. Bancorp. v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004).

As we have previously observed, summary judgment is available in discrimination cases as it is in other litigations. See Nieves v. Angelo, Gordon & Co., No. 05 Civ. 7782 (NRB), 2007 WL 1098710, at *3 (S.D.N.Y. Apr. 10, 2007) ("[S]ummary judgment applies no less to Title VII cases than to commercial cases or other areas of litigation, and plaintiff must still offer concrete evidence from which a reasonable juror could return a verdict in her favor.") (internal citations and quotations omitted). The "ultimate issue" in any employment discrimination case is whether a plaintiff has met his burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," that is, whether there was discriminatory intent. See Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 119 (2d Cir. 1997); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146 (2000).

In the absence of direct evidence of discrimination, courts apply the burden-shifting framework set out by the Supreme Court

in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).[7]
First, the plaintiff must establish a <u>prima facie</u> case of
unlawful discrimination.[8] If the plaintiff establishes a <u>prima
facie</u> case, "a rebuttable presumption of discrimination arises
and the burden then shifts to the defendant to articulate a
legitimate, non-discriminatory reason for the employment
decision." <u>Stratton v. Dep't for the Aging</u>, 132 F.3d 869, 879
(2d Cir. 1997); <u>see also</u> <u>Reeves</u>, 530 U.S. at 142-43.  If the
employer articulates a non-discriminatory reason for its
actions, the presumption of discrimination is rebutted and it
"simply drops out of the picture." <u>St. Mary's Honor Ctr. v.
Hicks</u>, 509 U.S. 502, 510-11 (1993); <u>see also</u> <u>James v. N.Y.
Racing Ass'n</u>, 233 F.3d 149, 154 (2d Cir. 2000). "The burden then
shifts back to the plaintiff to show, without the benefit of any
presumptions, that more likely than not the employer's decision
was motivated, at least in part, by a discriminatory reason."
<u>Fields</u>, 115 F.3d at 120-21; <u>Connell v. Consol. Edison Co.</u>, 109
F. Supp. 2d 202, 207 (S.D.N.Y. 2000)). To satisfy this burden,
the plaintiff may rely on evidence presented to establish his
<u>prima</u> <u>facie</u> case, as well as additional evidence, which may
include direct or circumstantial evidence of discrimination.

---

[7] The <u>McDonnell Douglas</u> framework was originally developed in the context of
Title VII, but applies in some form to most of plaintiff's claims.

[8]  The requirements for a prima facie case depend on the claim being alleged,
and will be discussed below in the context of each claim.

See <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 99-101 (2003);
<u>Harris v. City of New York</u>, No. 03 Civ. 6167(DLC), 2004 WL
2943101, at *2 (S.D.N.Y. Dec. 21, 2004).

It is not sufficient, however, for a plaintiff to show
merely that he satisfies "<u>McDonnell Douglas</u>'s minimal
requirements of a <u>prima facie</u> case" and to put forward "evidence
from which a factfinder could find that the employer's
explanation . . . was false." <u>James</u>, 233 F.3d at 153. Instead,
the appropriate question is whether there is sufficient evidence
in the record from which a reasonable trier of fact could find
in favor of plaintiff on the ultimate issue -- that is, whether
the record contains sufficient evidence to support an inference
of discrimination. See <u>James</u>, 233 F.3d at 154; <u>Connell</u>, 109 F.
Supp. 2d at 207-08.

B.  <u>Racial Discrimination Claims</u>

Plaintiff's first three causes of action complain of racial
discrimination in violation of Section 1981, the New York State
Human Rights Law ("SHRL"), and the New York City Human Rights
Law ("CHRL"). Plaintiff alleges both that she suffered racial
discrimination and that she was retaliated against for her
informal complaints of racial discrimination at UTS. The record
following full discovery does not contain sufficient evidence
from which a reasonable trier of fact could find an inference of

either racial discrimination or retaliation. Thus, these claims are dismissed.

## 1. Discrimination

To establish a claim of discrimination under Section 1981, a plaintiff must show "(1) that she is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination concerned one or more of the activities enumerated in § 1981." Lauture v. Int'l Bus. Mach. Corp., 216 F.3d 258, 261 (2d Cir. 2000). Section 1981 claims, as well as claims under the SHRL and CHRL, are analyzed as are Title VII claims. White v. Eastman Kodak Co., 368 Fed. Appx. 200, 202 (2d Cir. 2010) (citing Hudson v. Int'l Business Machines Corp., 620 F.2d 351, 554 (2d Cir. 1980) (discrimination claims under Section 1981 have same elements as Title VII); Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006) ("The standards for liability under [the SHRL and CHRL] are the same as those under the equivalent federal antidiscrimination laws."). Thus, in order to make out a prima facie case of racial discrimination in this action, Pearson must show that (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered from an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Id.

While unclear from the complaint, plaintiff's memorandum of law in opposition to the instant motion clarifies that the racial discrimination she allegedly suffered at UTS was not her termination of employment, but rather her treatment while working at the school. This distinction is significant, because UTS cannot offer the events of December 4, 2006 as a legitimate explanation for its treatment of Pearson throughout her employment.[9] Unfortunately, defendants somehow misread both the

---

[9] To the extent that the Court misreads plaintiff's submissions and she is alleging that she was improperly terminated because of her race, this assertion could not survive a motion for summary judgment. As addressed below, plaintiff does not provide sufficient evidence to allow a reasonable trier of fact to find that her termination was improperly based on any form of discrimination. In addition, there are several facts which make a claim of racial discrimination particularly untenable. First, the decisions to hire and fire Pearson were made by the same people, and plaintiff belonged to the same race at the time of both decisions. See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137-38 (2d Cir. 2000) ("When the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.'") (quoting Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997)). Furthermore, not only did the same individuals hire plaintiff, but they also granted her two raises as well as a promotion to full-time Admissions Director. These employment actions occurred in June 2005 (hiring), September 2005 (first raise), September 2006 (second raise and promotion), and December 2006 (firing). See Carlton, 202 F.3d at 137-38 (observing that "[c]ase law teaches that where the termination occurs within a relatively short time after the hiring there is a strong inference that discrimination was not a motivating factor in the employment decision" and citing to cases holding that two years between hiring and firing is a short enough period for the inference to apply).

Pearson might argue that these inferences should be overcome in this case because there is evidence that she was only hired to help UTS escape liability for the Alvarado situation. This argument is foreclosed, however, by the fact that Pearson was replaced by two minorities, at least one of whom is black. A history of firing people of a certain race and replacing them with people of the same race does not suggest discriminatory motivations towards people of that race. Furthermore, the record before the Court contains significant evidence that Pearson was a trusted member of the UTS staff who, even in the days leading up to December 4, was expected to make significant contributions to the admissions office for the foreseeable future. See Ex. 23 to Wallace Affirm. (emails between Hendricks and Pearson discussing recruitment strategy and upcoming events which Pearson should attend); Ex. 19 to Wallace Affirm. (advertisement from AM New York dated

complaint and the memorandum of law, and thus do not address this issue either in their moving papers or reply. Nevertheless, our independent review of the evidentiary record and applicable law makes clear that these claims cannot survive a motion for summary judgment.

For purposes of this motion, there can be little question that Pearson is a member of a protected class and was otherwise qualified for her position. As for whether she suffered adverse action, Second Circuit case law holds that an adverse employment action is a "materially adverse change in the terms and conditions of employment." Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (citation and internal quotation marks omitted). In order to be materially adverse, a change in working conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. Examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Id.

---

November 27, 2006 informing prospective students to contact Pearson for information regarding UTS).

    Thus, there can be no doubt that Pearson's dismissal was the result of events that occurred in close proximity to December 5, the date of her termination. Defendants claim the motivating event was Pearson's behavior on December 4. Pearson argues it was her complaints of racial discrimination.

Pearson alleges that she suffered the following adverse employment actions: (1) Winings "undermined and countermanded" her admissions decisions without reason; (2) Winings "took away responsibilities" and "routinely excluded her from important decisions and conference calls" on issues within her purview; (3) Winings "prevented" Pearson from attending senior management meetings for all department heads and administrators; (4) Winings "refused to meet" with Pearson "face to face" and was "generally divisive and hostile," even asking Plaintiff when she was "moving back to South Carolina." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n") at 12-13. None of these claims survive this motion for summary judgment.

Pearson's allegations that Winings undermined and countermanded her admissions decisions and policies do not rise to the level of material adversity. Winings was Pearson's supervisor at a very small academic institution; it is unrealistic for Pearson to believe she would have free rein over admissions decisions and policies without any input from her superior. Furthermore, Pearson has no material, tangible, or ownership interest in such decisions. While we recognize that there might be a set of facts in which a supervisor so egregiously "countermanded" the decisions of one of her employees that the interference rises to the level of material

adversity, this is not such a case. In fact, Pearson's broad allegations that her "decisions and policies" were "undermined and countermanded" without reason are conclusory statements unsupported by any specific factual allegations and would likely not even be enough to survive a Rule 12(b)(6) motion to dismiss.

Pearson's next claim is that Winings stripped her of parts of her duties. The relevant question for purposes of material adversity is whether the result of Winings' actions was "significantly diminished material responsibilities," or rather a simple "alteration of job responsibilities." See Sanders, 361 F.3d at 755. While we seriously doubt that Pearson alleges significantly diminished material responsibilities, we will bypass this issue as it is clear that no reasonable jury could find Winings took away job responsibilities from Pearson as a result of her race, and thus Pearson cannot demonstrate causation. The only "responsibility" that Pearson specifically identifies as having been taken from her is the planning of UTS' convocation event. Pl. Aff. ¶ 80. However, Pearson alleges that this task was given to Leander Hardaway. Hardaway is the African-American male who ultimately replaced Pearson after her termination. Thus, even if reassigning responsibility for the convocation event was materially adverse, it is impossible for a

reasonable jury to find that Winings took this action as a result of Pearson's race.[10]

Pearson's claims that Winings was "generally divisive and hostile" and refused to meet with her deserve little mention. These are broad, unsupported allegations which clearly cannot be the basis for allowing this action to move on to trial.

Pearson's most detailed and substantive allegation of discriminatory treatment is Winings' refusal to allow her to attend the senior management meetings at UTS' main campus in Barrytown. Pearson alleges that these meetings were held "every 5 or 6 weeks," that she never once attended, that she was the only "department head" at UTS who was routinely excluded, and that no "African-American or black" individuals were present. She also claims that an Asian field recruiter began to attend the meetings "within the first month of employment" and notes that this position is lower in rank than hers.

The Second Circuit has observed that "exclusion from critical meetings over a three or four month period might well be materially adverse." Sanders, 361 F.3d at 756. We are skeptical that these meetings are the sort of "critical" meetings that the Circuit has in mind, given that Pearson

---

[10] In this regard, we note that Pearson offers no direct evidence that taking away responsibility for the convocation event was motivated by discrimination, and simply relies on her general allegations of discriminatory practices at UTS, including Alvarado's termination, to create an inference that she was discriminated against. However, as we have noted, any such inference is overcome by the fact that the responsibility in question was granted to a member of the same race.

provides no explanation as to how her presence at these meetings would have any tangible or material effect on the terms or conditions of her employment with UTS. See, e.g., Weeks v. New York State Div. of Parole, 273 F.3d 76, 86-87 (2d Cir. 2001) (noting claim of adverse action must fail where plaintiff did not allege what "tangible adverse effect" it had on the terms and conditions of her employment).

Regardless of whether this rises to the level of material adversity, defendants offered several legitimate reasons for Pearson's absence from these meetings.[11] First, Pearson was not in the "President's Cabinet" since she was only the Admissions Director for the Extension Center and not UTS as a whole. In fact, there was an Admissions Director for all of UTS who was senior to Pearson and attended regularly.

Second, no employees from the Extension Center attended these meetings, since they were all under the supervision of Winings, who would attend as the representative from the Extension Center. When asked by Pearson's counsel why other employees from the Extension Center, and Pearson in particular, were not invited to attend along with Winings, Hendricks provided several considerations. Ex. III to Wallace Affirm. First, Winings was perfectly capable of representing the Extension Center on her own. Second, the expense in getting to

---

[11] While defendants do not address this issue in their memoranda of law, Winings and Hendricks were both asked about this at their depositions.

Barrytown, both in terms of money spent and time wasted, was considered prohibitive and unnecessary.[12] Third, Hendricks noted that Pearson's presence was particularly redundant since he was able to receive updates concerning recruitment and admissions at the Extension Center through two avenues: Winings, who was in charge of the Extension Center and worked closely with her employees, and the Admissions Director for all of UTS.

Pearson's attempts to paint these explanations as pretextual are unavailing. She argues that the concern about expense is not credible since Pearson easily could have traveled with Winings to the meetings, and that Pearson would "often" be asked to go to Barrytown for other reasons. While this may be so, it is entirely reasonable, in fact rational, for UTS to prefer Pearson to stay at the Extension Center and take care of her obligations rather than spend time traveling to Barrytown to attend these meetings. This is particularly the case since there was already a representative both of the admissions department and the Extension Center at these meetings.

Pearson also argues that Winings and Hendricks directly contradicted each other with regard to whether Pearson should have been present at these meetings, and thus their testimony is not credible. She notes that Winings testified that Pearson was

---

[12] We note that Barrytown, New York is approximately two hours away from midtown Manhattan by car. Mapquest (March 23, 2011), http://www.mapquest.com (search "Get Directions" with "4 West 43rd Street, New York, NY" as starting address and "30 Seminary Dr, Barrytown, NY" as destination).

not a member of the cabinet because she was not the Admissions Director for all of UTS, whereas Hendricks testified that Pearson was a "key administrator at the Extension Center." Exs. II, III to Wallace Affirm. This is a highly selective quote by Pearson's counsel, as when Hendricks was asked why Pearson was "key," he responded "because it was a very small staff [at the Extension Center] and everyone was key." Ex. III to Wallace Affirm. Later, when Pearson's counsel once again pressed on how Pearson was "key" to the Extension Center, Hendricks reiterated that "[e]veryone was. Everyone was key." Id.

Ultimately, the only evidence Pearson provides for the notion that her absence from these meetings was discriminatory that has not been entirely discredited is her allegation that no black members of UTS were present and the inference she asks us to draw from the Alvarado situation. Given defendants' reasonable and consistent explanations for her absence and the tenuous circumstantial evidence on which Pearson asks us to rely, we find that no rational jury could find there were discriminatory motivations in keeping her from these meetings.

It appears that Pearson's counsel, in an effort to remove the events of December 4 from this litigation, has attempted to concoct any possible legal theory or set of facts in which his client could defeat this motion for summary judgment. We are not persuaded. The anti-discrimination laws are not intended to make

federal courts the managers of corporate America, and not every perceived slight or injustice warrants a lawsuit. See, e.g., Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (discrimination laws do not set forth a "general civility code for the American workplace"). Plaintiff has failed to point out any practical, monetary, or advancement consequence to her as a result of any of defendants' alleged actions, or that there was an actual negative impact on her ability to do her job. She also has not submitted evidence by which a reasonable jury could believe any employment action taken against her was done as a result of her race. Thus, all of her claims of racial discrimination must be dismissed.

2. Retaliation

Pearson alleges that her termination was retaliatory in violation of Section 1981, the SHRL, and the CHRL. Retaliation claims under these statutes are evaluated using the three-step McDonnell Douglas burden shifting analysis discussed above. See Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010).

In order to make out a prima facie case of retaliation under Section 1981,[13] Pearson must "adduce evidence sufficient to

---

[13] Defendants appear to believe that plaintiff only alleges retaliation under the CHRL and SHRL. Defs.' Mem. of Law in Support of Mot. for Summary Judgment ("Defs.' Mem.") at 16. However, plaintiff's complaint alleges that defendants "intentionally retaliated against and discriminated against" her in violation of Section 1981. Thus, we read plaintiff's complaint as including a Section

permit a rational trier of fact" to find that (1) she engaged in protected activity under the anti-discrimination statutes; (2) the employer was aware of this activity; (3) the employer took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action. Id. (quoting Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006)). Retaliation claims under the SHRL and CHRL are analyzed as though they are claims under federal law, with the exception that under the CHRL any retaliation, material or not, suffices for plaintiff to establish a retaliation claim. Fincher, 604 F.3d at 723 ("Under the CHRL, retaliation "in any manner" is prohibited, and the "[t]he retaliation...need not result in an ultimate action with respect to employment...or in a materially adverse change in the terms and conditions of employment.") (quoting N.Y.C. Admin. Code § 8-107(7)). This is not a meaningful distinction in this case, as Pearson's termination is clearly an adverse action under any statutory scheme.

Defendants argue that Pearson has failed to establish a prima facie case of retaliation because there is no evidence that she engaged in protected activity or that there was a

---

1981 retaliation claim as well. Of course, as the legal standards for retaliation claims under these statutes are identical in all respects relevant to this decision, reading plaintiff's complaint in this way has no practical impact on our decision or analysis. Furthermore, we will assume defendants' legal arguments as to why Pearson does not have a claim under the SHRL and CHRL apply with equal force to Section 1981.

causal connection between any potential protected activity and her discharge. Defs.' Mem. at 17. Granting plaintiff every reasonable inference, it does appear that she has met the "minimal" burden necessary for establishing a prima facie case.[14] See Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir. 2009) (citing St. Mary's Honor Ctr. V. Hicks, 509 U.S. 502, 506 (1993)). We will not address these issues in detail, however, because assuming arguendo that Pearson has met her prima facie burden, defendants provide a legitimate, non retaliatory reason for Pearson's termination and she does not submit sufficient evidence to allow a reasonable trier of fact to conclude that the proffered reason is pretextual or that her termination was retaliatory.

A. Defendants' Stated Reason for Termination

Assuming that Pearson has presented a prima facie case of retaliation, the burden shifts to the defendants to articulate a legitimate, nonretaliatory reason for the employment decision. This is a burden of production, not persuasion; the defendants'

---

[14] Her internal emails complaining of racism within UTS could qualify as protected activity, and the temporal nexus between this protected activity and her termination could satisfy the causation requirement. See, e.g. Crawford v. Metro. Gov't of Nashville & Davidson County, 129 S.Ct. 846, 851 (2009) (noting that when an employee "communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity") (emphasis in original) (internal quotation omitted); Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001) (noting courts within this Circuit have not "drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship" but citing with approval cases granting the inference with far greater lapses of time than one month").

obligation is to "clearly set forth, through the introduction of admissible evidence, the reasons for the [employment action]." Baguer v. Spanish Broad. Sys., No. 04 Civ. 8393 (RJS), 2010 U.S. Dist. LEXIS 69212 at *15-16 (S.D.N.Y. July 12, 2010) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)).

The defendants clearly satisfy this requirement. They introduced ample evidence for the proposition that UTS terminated Pearson for the events of December 4. This is clearly a legitimate, non-discriminatory reason for termination. See, e.g., Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 171 (2d Cir. 2006) (making a threat is a legitimate, non-discriminatory reason for termination).

B. Evidence of Pretext

Since defendants have met their burden of producing a legitimate, nondiscriminatory reason for plaintiff's discharge, the presumption of discrimination created by the prima facie case simply "drops out of the picture." Cifra v. General Electric, 252 F.3d 205, 215 (2d Cir. 2001) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)). Our focus now shifts to whether plaintiff has provided sufficient evidence for a factfinder to conclude that defendants' purported rationale was actually a pretext for retaliation. The plaintiff must not simply produce "some" evidence, but "sufficient evidence to

support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant[s] were false, and that more likely than not [retaliation] was the real reason for the employment action." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (quoting Woroski v. Nashua Corp., 31 F.3d 105, 110 (2d Cir. 1994)).

Aside from the temporal nexus between the protected activity and adverse employment action, Pearson argues that there is evidence that Winings "exaggerated" the events of December 4 and fabricated the water bottle incident after she learned about plaintiff's accusatory email on the morning of December 4. Pearson suggests that this evidence is significant not only to disprove defendants' version of the events, but also to demonstrate that Winings had a retaliatory motive and willfully manufactured a story in order to get rid of Pearson.

Pearson's first piece of evidence regarding Winings' credibility is a page of notes written by Hendricks on the morning of December 4. Ex. 39 to Wallace Affirm. Pearson claims that the notes are Hendricks' contemporaneous account of his telephone conversations with Winings. The account makes no mention of the water bottle incident. It also appears to reflect that Winings made two separate calls to Hendricks on the morning of December 4. During the first call, Winings reported only that Pearson "had been in her office all weekend, was cursing and

singing loudly, throwing crackers around, tore the name plate off Dr. Winings' door, and would not let anyone in her office." Winings further informed Hendricks that she "had called the building security." Hendricks noted that he "advised her to get the security's assessment; soon thereafter...security assessed and advised that EMS be called, that Veronica needed to be hospitalized." It appears that the last note relating to this call is that Hendricks "informed Dr. Winings of the e-mail Veronica had sent at 5 a.m. this morning accusing UTS of being racist." Ex. 39 to Wallace Affirm.

Pearson believes the contents of this first call are relatively tame, and that it is significant that the notes conclude with Hendricks mentioning that he informed Winings of Pearson's email. This is because it appears that there was a second call from Winings to Hendricks in which Winings reported far more severe behavior. The account reads that "Dr. Winings called later to report that the EMS had come, that Veronica had threatened to kill Dr. Winings and then to kill herself. She insisted that the EMS were not really EMS but were a limo service to take her to the airport where she could fly to South Carolina to protect her children from Dr. Winings. [A student] came and helped calm Veronica and witnessed and cooperated with the actions of the EMS, who took her to Belleview or Cabrini, KW was not sure, for 72 hours observation." It then mentions who

34

witnessed the episode, other odd behavior that a security official had witnessed from Pearson that morning, and that Hendricks approved the hiring of a temp to deal with the phone for the recruitment office "for the week" but that "[u]nfortunately Veronica would not report her access code on her phone." The account concludes that "Dr. Winings surmises that the crisis came due to Veronica's being caught in a lie regarding her absence this week. One of the EMS people said that Veronica may be bipolar and, not being at home, has not taken her meds." Ex. 39 to Wallace Affirm. Pearson argues that the order of phone calls, coupled with the fact that the second call reported significantly more severe behavior, creates an inference that the events described in the second phone call were exaggerated by Winings after learning that Pearson had accused her of racism that morning.

Separate from this account, Pearson points our attention to a series of statements made by Winings regarding the events of December 4 which do not mention the water bottle incident. First, in a letter dated December 5, 2006, Winings wrote to New Yorker Hotel security and informed them of Pearson's termination and the events of December 4 before requesting that security bar her from entry into the building in the future. The letter states:

"As you may have witnessed or heard about yesterday, the police were called together with EMS because Ms. Pearson was acting as an extremely emotionally-disturbed person. She not only tried to damage property, but she was also walking around the halls in a bathrobe and slippers, swearing publicly, and generally acting in a most bizarre manner. She also created a public disturbance and, even more serious, threatened the life of the Dean of the campus. Ultimately, she was heard threatening to take her own life later in the morning. UTS takes these threats seriously and so is most concerned."

Ex. 7 to Wallace Affirm.

Next, in the notice of termination sent to Pearson by Hendricks, there is no explicit mention of the water bottle incident. The letter simply informs that she was terminated for "disruptive behavior, property damage, [and] curses and threats of harm addressed to your supervisor." Ex. 5 to Wallace Affirm. Lastly, there is a form Winings filled out for the Department of Labor, where in response to the prompt "[p]lease explain he specific reason you chose to terminate the claimant," Winings simply quoted directly from this termination letter and did not reference the water bottle. Ex. 9 to Wallace Affirm. In response to the question "[w]hat reason did the claimant give you for his/her actions that led to his/her discharge," Winings wrote "claimant offered no explanation; claimant was incoherent and subsequently escorted from the premises by building security, NYPD, and EMS." Id.

Pearson also argues that Winings' testimony regarding where she and Pearson were standing at the time of the alleged assault and the trajectory of the bottle is a "physical impossibility." Pearson points to exhibits in the record of photographs of a hallway at UTS' offices where the incident allegedly occurred. These photographs were shown to Winings during her deposition, who was asked to identify (1) where she was standing, (2) where Pearson was standing, (3) Marion Wallace's door, which was allegedly struck by the water bottle, and (4) the trajectory of the bottle. Pearson argues that these identifications establish that the bottle could not have been thrown at Winings. Exs. 1-4 of Wallace Affirm.

Pearson further surmises that if the incidents of December 4 were as egregious as defendants claim, the police at the scene would have filed a police report or UTS would have sought a restraining order or order of protection against Pearson. Neither occurred, and Pearson believes that the latter is particularly instructive because the local police precinct was directly adjacent to the New Yorker Hotel.

Finally, Pearson notes that there were no eyewitnesses to the assault, and that all of the affidavits submitted in support of defendants' version of the events are from members of the Unification Church. Pearson argues that the affiants, including Winings and Hendricks, all share "complete devotion to the

leader of that Church, Rev. Sun Myung Moon. Hence, their credibility cannot be taken for granted but must instead be assessed by the trier of fact." Pl.'s Opp'n at 22.

Pearson's evidence, much of which is simply argument and speculation, is insufficient to create an inference of retaliation such that a reasonable trier of fact could find that she was terminated for impermissible reasons. Inasmuch as she relies on supposed inconsistencies in defendants' version of the events, we strongly disagree. While not every report mentions the water bottle incident or the series of events in identical ways, defendants have been consistent in maintaining that Pearson acted in a completely unacceptable manner on December 4. Furthermore, a great deal of inherently reliable evidence, including the affidavits of several third parties and Pearson's own prior testimony to the Department of Labor, strongly contradicts Pearson's version of events.[15]

More significantly, even accepting every word of Pearson's allegations, it is far from clear that UTS would not have been justified in terminating her. It is not disputed that Pearson

---

[15] While we will refrain from relying on a "credibility assessment," we must note that Pearson's allegations are almost entirely implausible. Her story is so tame that it is impossible to accept the proposition that it would lead to hospitalization for seventy-two hours of observation at the outset and ultimately ten days before discharge. In addition, there is no assertion by Pearson or any evidence in the record that defendants directed the security officers, policemen, or EMTs to take the actions they did.

Thus, Pearson's mild version of events is refuted by third party actions and her lengthy hospital stay.

engaged in a loud argument with her boss and called her a "racist" and a "liar." Whatever occurred, it required the presence of building security, the NYPD, and EMS. This is not acceptable office behavior, and a complaint of racial discrimination does not shield an employee from termination when she acts inappropriately. A small, non-profit institution such as UTS, and particularly a work environment such as the Extension Center, is surely justified in terminating an employee who acted as Pearson admits she did.

It is not sufficient for a plaintiff to simply rely on "evidence from which a factfinder could find that the employer's explanation...was false." James, 233 F.3d at 153. Viewing Pearson's evidence in its best light, this is all she does. She clearly does not present "sufficient evidence...from which a reasonable trier of fact could find in [her] favor...on the ultimate issue" that she was terminated in retaliation for her allegations of racial discrimination. Id. at 154. Thus, her claims must be dismissed.

C.  FMLA Claims

Plaintiff's fourth claim is that defendants interfered with her rights under the FMLA by "terminating [her] employment for having taken FMLA medical leave for a serious medical condition, and not reinstating her to her former position." Compl. ¶ 168. While not without doubt, it appears that plaintiff is alleging

39

an interference claim, rather than retaliation, under the FMLA. This difference is irrelevant, however, as any claim under the FMLA must be dismissed.

The FMLA entitles an "eligible employee" to twelve workweeks of leave during a twelve month period because of a "serious health condition" making her unable to perform the functions of her employment. 29 U.S.C. § 2612(a)(1). Upon returning from leave, the employee is "entitled" to return to the position she held prior to taking leave, though this right is not absolute. Sista v. CDC Ixis N.A., Inc., 445 F.3d 161, 174 (2d Cir. 2006). In order to bring a successful entitlement claim under the FMLA, the employee must demonstrate "(1) that the employer interfered with, restrained, or denied the rights protected by the FMLA, and (2) that the employee has been prejudiced by the violation." Roberts v. Health Ass'n, 308 Fed. Appx. 568, 569 (2d Cir. 2009) (citing Ragsdale v. Wolverwine World Wide, Inc., 535 U.S. 81, 89 (2002)). In order to state a prima facie claim of such interference, a plaintiff must show that (1) she was an eligible employee under the FMLA; (2) UTS is an employer under the FMLA; (3) she is entitled to leave under the FMLA; (4) she gave notice to UTS of her intention to take leave; and (5) she was denied the benefits which she was

entitled under the FMLA. <u>Brown v. Pension Bds.</u>, 488 F.Supp.2d 395, 408 (S.D.N.Y. 2007).[16]

Defendants raise a number of potential issues with Pearson's claim that she was entitled to FMLA leave. These issues are irrelevant, however, because Pearson "cannot show that the [UTS] considered [her] FMLA leave and request to return a negative factor in its decision to terminate." <u>Sista</u>, 445 F.3d at 176. Even assuming that Pearson's stay at the hospital constituted FMLA leave, and that UTS is governed by the statute, it is well-settled that an employer is not liable for "interfering" with an employee's leave when the employee would have been terminated regardless of the leave. <u>See</u> <u>Id.</u> at 175-177; <u>see also</u> 29 C.F.R. 825.216(a) ("An employee has no greater right to reinstatement...than if the employee had been continuously employed during the FMLA leave period."); <u>Throneberry v. McGehee Desha County Hosp.</u>, 403 F.3d 972, 979 (8th Cir. 2005) ("As long as an employer can show a lawful reason, i.e., a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her position, the employer will be justified to interfere with an employee's FMLA leave rights."); <u>Geromanos v. Columbia Univ.</u>,

---

[16] Although district courts in this Circuit have referred to elements of a prima facie case of interference under the FMLA, the Second Circuit has yet to determine that such claims are subject to the <u>McDonnell Douglas</u> analysis and in fact has hinted that they are not. <u>See</u> <u>Sista</u>, 445 F.3d at 175-76; <u>Potenza v. City of New York</u>, 365 F.3d 165, 167-68 (2d Cir. 2004).

322 F. Supp. 2d 420, 429 (S.D.N.Y. 2004) ("FMLA is not a shield to protect employees form legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave.").

Just as the plaintiff in Sista, Pearson cannot "establish that [she] was discharged for taking the leave or that it was a 'negative factor' in [UTS'] decision to fire" her. Sista v. CDC Ixis N. Am., Inc., No. 02 Civ. 3470 (GBD), 2005 U.S. Dist. LEXIS 2163 at *24-25 (S.D.N.Y. Feb. 10, 2005) (district court decision in Sista). Not only does it appear clear that she was terminated for her conduct of December 4, but there is not a scintilla of evidence for concluding that her "leave" played any role in this employment decision.

Any purported retaliation claim would fail for the same reason. Unlike interference claims, the Second Circuit has held that retaliation claims under the FMLA are subject to the McDonnell Douglas burden shifting analysis. Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004). In order to show a prima facie case, Pearson must show (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. Even assuming Pearson could make out a prima facie case of retaliation, which

is far from clear,[17] she does not provide any evidence from which a reasonable factfinder could conclude that UTS' stated explanation for her termination was merely a pretext masking impermissible retaliatory motives.

   C. Disability Discrimination

   Pearson's last two causes of action allege disability discrimination in violation of the CHRL and SHRL. Notably, Pearson does not bring a claim under the Americans with Disabilities Act, 42 U.S.C.S. § 12012 et seq. ("ADA"). However, with one exception not relevant to this motion,[18] claims brought under the SHRL and CHRL are analyzed identically to claims brought under the ADA, including the use of the familiar three-step burden shifting analysis discussed above. Ferraro v. Kellwood Co., 440 F.3d 96, 99-100 (2d Cir. 2006).

   To establish a prima facie case, Pearson must show (1) UTS is subject to the ADA; (2) she was disabled; (3) she was qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered an

---

[17] In order to make out the first prong of a retaliation claim, a plaintiff must demonstrate that she was actually entitled to FMLA leave. See Milne v. Navigant Consulting, 08 Civ. 8964 (NRB), 2010 U.S. Dist. LEXIS 115650 at *37-38 n.19 (S.D.N.Y. Oct. 27, 2010) (Buchwald, J.). As noted above, this is very much in dispute.

[18] The only significant difference between claims under the ADA and local disability law is that the "definition of disability under the former is considerably broader than the ADA definition." Primmer v. CBS Studios, Inc., 667 F. Supp. 2d 248, 261-62 (S.D.N.Y. 2009). Here, there is no dispute that Pearson suffered from a disability under federal or local law. Thus, case law governing the ADA will be utilized in determining this motion.

adverse employment action because of her disability. Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001).

Defendants argue that Pearson has not established a prima facie case because she cannot demonstrate that they had knowledge of her disability or that there was any causal connection between her disability and her termination. At this stage in the litigation, we do believe that plaintiff has met her prima facie burden. While it is true that Pearson may not have disclosed her disability when she first started her employment at UTS, there is certainly enough circumstantial evidence that the events of December 4 should have, and in fact did, put UTS on notice of her disability. See Ex. 37 to Wallace Affirm. Furthermore, given that she was fired a day after such notice, there is the requisite causal showing for a prima facie case. We need not address these issues in any great depth, however, because even assuming that Pearson has established a prima facie case it is once again clear that she cannot rebut defendants' legitimate, non-discriminatory, non-pretextual reason for her dismissal.

In Sista, the Second Circuit held that making a threat against an immediate supervisor was a reasonable basis for terminating employment. Sista, 445 F.3d at 172 (determining that an employee's threats against his supervisor is a consideration for the second step of the McDonnell Douglas analysis rather

than the question of whether he was "otherwise qualified" for
his position). In so doing, the Court of Appeals adopted a
section of an amicus brief from the EEOC, which stated that an
employer "may discipline or terminate an individual who, because
of disability, makes a threat against other employees if the
same discipline would be imposed on a non-disabled employee
engaged in the same conduct." Id. at 171. It then quoted
approvingly from a Seventh Circuit case holding that "The [ADA]
does not require an employer to retain a potentially violent
employee. Such a requirement would place the employer on a
razor's edge – in jeopardy of violating the [ADA] if it fired
such an employee, yet in jeopardy of being deemed negligent if
it retained him and he hurt someone." Id. at 172 (quoting Palmer
v. Circuit Court, 117 F.3d 351, 352 (7th Cir. 1997)). Finally,
it concluded that this "approach ensures that this Court, like
every other court to have taken up this issue, does not read the
ADA to require that employers countenance dangerous misconduct,
even if that misconduct is the result of a disability." Id.

The rule of Sista clearly forecloses plaintiff's argument
that since her disability caused her conduct, she was in essence
fired because of her disability. Furthermore, it is clear that
defendants have put forth a legitimate reason for her
termination, and Pearson provides no evidence that this reason
is merely pretextual. There is simply no basis to conclude that

Pearson's fate was any different than would have befallen any other employee who engaged in the conduct of December 4, even were we to accept Pearson's version of the events.

E.    CHRL Claims

As discussed above, all of Pearson's claims, including those under the CHRL, are dismissed. We write in this separate section to address plaintiff's argument that the CHRL holds employers to a higher standard than state or federal statutes. It is true, as plaintiff points out, that New York courts have found that the CHRL is broader than state and federal law. These courts have noted that the CHRL's "legislative history clearly contemplates that the [CHRL] be liberally and independently construed with the aim of making it the most progressive in the nation" and that the "case law that has developed in interpreting both the [SHRL] and [federal law] should merely serve as a base for the [CHRL], not its ceiling." Jordan v. Bates Adv. Holdings, Inc., 816 N.Y.S.2d 310, 317 (N.Y. Sup. Ct. 2006).

However, beyond the well-settled distinctions in the law that we have noted where applicable above, plaintiff provides no example or argument of where the CHRL provides a rule of law that would change any of the grounds for the determination in this motion. Plaintiff does not, and we believe she cannot, argue that the CHRL prevents an employer from terminating an

employee who has engaged in violent and threatening behavior towards a supervisor. She also does not claim that the CHRL in any way changes the applicable burdens of proof or any other rule of law which could be considered dispositive in this decision. Thus, while the CHRL may be broader than state and federal anti-discrimination law, on the facts of this case these claims are also dismissed.

## CONCLUSION

For the aforementioned reasons, all of plaintiff's claims are dismissed. The only remaining claim is defendants' counterclaim for assault. Defendants allege jurisdiction for their counterclaim under 28 U.S.C. § 1343 and 28 U.S.C. § 1367(a). There is no jurisdiction pursuant to 28 U.S.C. § 1343 as defendants do not allege any facts to support a conclusion that Pearson's assault was done in furtherance of a conspiracy, under color of state law, or pursuant to any other grounds providing jurisdiction under 28 U.S.C. § 1343. With regard to supplemental jurisdiction, "district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Consequently, "where the federal claims are dismissed before trial, the state claims should be dismissed as well." Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998). Having dismissed Pearson's claims

against defendants, we decline to exercise supplemental jurisdiction over the counterclaim, which is dismissed without prejudice.


**SO ORDERED.**


Dated:     New York, New York
           March 23, 2011

                                        NAOMI REICE BUCHWALD
                                        UNITED STATES DISTRICT JUDGE


        Copies of the foregoing Order have been mailed on this date
to the following:

Ian Francis Wallace
501 Fifth Avenue, 19th Floor
New York, NY 10017

Leroy J. Watkins, Jr.
Jackson Lewis LLP
666 Third Avenue
New York, NY 10017